DENISTON *v.* PHILLIPS.

Opinion delivered January 3, 1916.

1. APPEAL AND ERROR—FINDINGS BY CHANCELLOR.—Unless against the preponderance of the evidence, the finding of fact of the chancellor will not be disturbed on appeal.

2. DEEDS—INTENTION OF GRANTOR—DELIVERY.—Where deceased executed two deeds to certain lands, to his wife and daughter, *held*, although the deeds were in a valise belonging to him at the time of his death, that the evidence showed that he had intended their delivery, and that the same had been delivered.

3. FRAUDULENT CONVEYANCES—FRAUDULENT DESIGN—TIME OF DELIVERY.—Although deceased executed a deed with the intent to defraud creditors, the deed does not take effect until delivery, and when it was not delivered until a subsequent time, when there were no creditors of deceased who could suffer by the transfer, the deed will not be held void.

4. DEEDS—REFORMATION—IMPROPER DESCRIPTION.—A deed from a husband to a wife, given for a valuable consideration, containing an incomplete description of the land conveyed, will, at the suit of the wife, be reformed to show the proper description.

Appeal from Clay Chancery Court, Eastern District; *E. D. Robertson*, Chancellor; reversed.

*Lamb, Caraway & Wheatley*, for appellants.

1. The deed to the daughter, Isabel, was in fact delivered, as shown by a clear preponderance of the evi-

dence. It was not a technical delivery, but an actual manual delivery.

2. The conduct of Mrs. Hicks and Mrs. Phillips, together with the emphatic contradictions of them by other witnesses, interested and disinterested, render them unworthy of belief. The deeds to Mrs. Deniston, his daughter, Isabel, and to Judge Royal, were not made to protect James Deniston from his creditors.

3. The deed to Mary E. Deniston should have been reformed. The validity and delivery of this deed is not questioned. This deed was also for a valuable consideration. Her title should be quieted.

*Spence & Dudley,* for appellees.

1. The deed to Isabel Harmon should be cancelled (1) because fraudulent as to creditors, and (2) it was never delivered. Kirby's Dig., § 81; 74 Ark. 273.

2. The deed to Mrs. Deniston was void and conveyed no title. The description was insufficient; a patent ambiguity which can not be aided by parol evidence. 30 Ark. 657; 35 *Id.* 470; 68 *Id.* 150. The finding of the chancellor is sustained by the evidence that the deed was never delivered. 100 Ark. 427; 98 *Id.* 466; 97 *Id.* 283; 108 *Id.* 53.

McCULLOCH, C. J. James Deniston lived in Clay County, Arkansas, and died there on March 19, 1913, leaving surviving his widow and eleven children, the issue of his two marriages. He owned lands in that county, and in the year 1897 he executed three deeds, one to his daughter Isabel, conveying a tract of 80 acres, and another to his wife, conveying a quarter section, and another to E. N. Royal, conveying a tract containing 80 acres. Those deeds were never recorded during the life time of of James Deniston, and a few days before his death he caused the Royal deed to be destroyed. The two deeds to his wife and to his daughter Isabel were recorded shortly after his death.

The plaintiffs, who are some of the surviving children of James Deniston, instituted suit against the widow and the daughter, Isabel Harmon, to cancel the two deeds

which had been placed of record. They allege in the complaint that the deeds were never delivered by James Deniston, and in addition thereto that James Deniston was liable as security on a bond at the time he executed the deeds and that the deeds were executed with fraudulent purpose of placing his property beyond the reach of his creditors. The deed to Mrs. Deniston, the widow, fails to accurately describe the lands, in that mention of the township and range is omitted. Mrs. Deniston filed a cross-complaint asking for reformation of the deed so as to accurately describe the lands. She alleged and attempted to prove that the deed was executed by her husband, not as a gift but for a valuable consideration, and that the same was delivered to her and should be reformed so as to conform to the intention of the parties to the conveyance.

(1)    The case was heard by the chancellor upon the testimony of witnesses presented in the form of depositions and the court rendered a decree granting the relief prayed for in the original complaint. The decree awards dower in the lands to the widow and orders a sale for partition by the heirs. This appeal presents a question of fact, and under the practice in chancery cases it becomes our duty only to determine whether or not the findings of the chancellor upon the issues of fact are in accord with the preponderance of the evidence. Unless against the preponderance of the evidence, it is our duty to sustain the findings of the chancellor.

The case presents a typical family quarrel in which a portion of the heirs of James Deniston are arrayed on one side and his widow and the one other heir are arrayed on the other. Most of the testimony relates to declarations made by James Deniston during his lifetime and alleged controversies and contradictory statements made by the children in their dealings with each other concerning the validity of the deed after his death. The facts are undisputed that James Deniston executed the three deeds hereinbefore mentioned in the year 1897, and the evidence is sufficient to warrant the conclusion

that he executed the deeds in anticipation of a liability on a bond which he had signed as surety. The Royal deed was, as before stated, destroyed at the direction of James Deniston a few days before he died, and the other two deeds were found among his other papers at the time of his death. Mrs. Harmon claims that her father delivered her deed to her about two and a half years before he died, and that she kept it in her possession about six months, when it was placed in a valise or satchel of her father's with other valuable papers when they were moving, in order to take care of it, and that she let it remain in that place until after her father died. She lived with her father and claims that she received the rent of the land, though other evidence shows that the rents were paid over to her father from year to year. She was living with her father, it seems, at the time of his death.

(2)   James Deniston, a few days before his death, sent for a neighboring justice of the peace and had his wife or some of his children to get out the bundle of deeds, and he directed the justice of the peace to destroy the Royal deed and also to destroy a paper pertaining to his membership in a certain lodge. The justice of the peace, Squire Hill, testified to those facts and stated that he saw the deed to the widow, Mrs. Deniston, but that he did not see at that time the deed of Mrs. Harmon. His testimony does not seem to be altogether clear on the subject and is not conclusive of the fact that the deed to Mrs. Harmon was not in the bundle which he was called upon to examine at that time. On the contrary, the evidence is quite conclusive that the deed to Mrs. Harmon was in that bundle. At any rate, Squire Hill was not given any directions to destroy that deed, but he states that James Deniston gave directions to put the other deeds and papers back in the place from which they had been taken. Deniston gave no directions for the destruction of any papers except the Royal deed and what the witnesses call the lodge paper. The conclusion is irresistible that, regardless of the motives which originally prompted James Deniston to convey the lands

to his wife and his daughter Isabel, it was his intention up to the time of his death to leave those deeds intact.

There is doubt on the question of an actual delivery, but we are of the opinion that the preponderance of the evidence is to the effect that there was delivery of each of those deeds. Mrs. Deniston and Mrs. Harmon both testified positively that each of the deeds was delivered, and there is no direct testimony in conflict therewith. About the only testimony of any force against the theory of delivery of the deeds is that the deeds were actually found among the papers of James Deniston after his death, and that during his lifetime he often spoke of the transaction as merely an effort on his part to get his lands out of his own name as to escape the reach of his creditors. Now, we think that the fact that James Deniston referred to the lands as having been conveyed away beyond the reach of his creditors affords very strong proof that he treated the deeds as having been delivered; and that, together with the positive testimony of the two grantees that the deeds were in fact delivered constitutes sufficient evidence of the delivery so as to pass the title. Our conclusion is that the best and most satisfactory evidence in the case is to the effect that James Deniston delivered the deeds with the intention of passing the title to the respective tracts of land to his wife and daughter.

(3) Now, the other question relating to the intention of Deniston to convey the lands in fraud of his creditors remains to be disposed of.

A statute of this State authorizes a suit to be brought for the benefit of the heir of a decedent to cancel a deed executed for the purpose of defrauding creditors. Kirby's Digest, § 81; *Moore* v. *Waldstein,* 74 Ark. 273. The evidence tends, as we have already stated, to show that the original purpose of the conveyance was to place the lands beyond the reach of Deniston's creditors, at least, that such was the design as to the deed of Mrs. Harmon. But the evidence shows that the deed was not delivered, if it was delivered at all, until long afterwards, and there is no evidence at all in the record that at the time of

of the alleged delivery of the deed Deniston was indebted to anyone or that he had any purpose of defrauding creditors. On the contrary, the evidence showed that the deed to Royal was destroyed because the reason for the conveyance had ceased to exist. In other words, that there was no longer any creditors to defraud, and that, therefore, the fraudulent deed of conveyance to Royal could be destroyed. Our conclusion, therefore, on that branch of the case is that the decree of the chancellor cannot be sustained on the ground that it was a fraudulent conveyance; for even if the original execution of the deed was grounded in fraud, the title passed at the time of the delivery, and if there was no fraudulent design at that time and no creditors to suffer by reason of the conveyance, it cannot be set aside because of the original intention of the grantor at the time he executed the deed.

(4) The deed to Mrs. Deniston should have been reformed. It was not a deed of gift, but one, according to the evidence, made for a valuable consideration. Mrs. Deniston, testified that she conveyed another tract of land to her husband and that she furnished money to purchase this particular land that was conveyed to her, but that her husband took the title in his own name, and that the intention of this conveyance was to place the title in her, where it rightfully belonged. There is very little, if any, dispute about the truth of her statements, and under those circumstances she was entitled to a reformation of the deed so as to carry out the agreement and do justice between the parties. Equity treats that as done which ought to have been done, and according to that well known maxim this deed should be reformed.

The decree of the chancellor is therefore reversed, and the cause is remanded with directions to dismiss the complaint of the plaintiffs for want of equity and to grant the prayer of the cross-complaint of Mrs. Deniston for a reformation of the deed to her. It is so ordered.